Case 6:07-cv-00776-TC   Document 1-2   Filed 05/24/07   Page 1 of 20

Plaintiff's Exhibit 001
Page 1 of 1

# New computer programs challenge city officials

By Susan T. Wehren
Of the News-Times

*Editor's note: This is the second in a series of articles about Newport's new city hall and the employees who work in it.*

The City of Newport is finding that it is able to save money with its new computer programs, but getting everything operational is proving to be a challenge.

When the city hall was moved to its new location last fall, it gave the city a chance to upgrade computer software and hardware. In the long run, money will be saved from cancelled support and maintenance contracts on old systems.

In the short run, long work days have resulted, as employees rush to meet deadlines and get everything online.

Out is the old main frame hardware, as everything is wired into the new server, along with the telephone and computer systems.

Three software programs were purchased. NaVision is for accounting and payroll; Vadim is for business licenses, cash and utility bills; and Access Data is for municipal court.

The city could not find one company that would provide everything in one system, said Brent Winiger, finance director for the city.

Cost for the new software and hardware was $150,000, but the city expects to save $50,000 to $60,000 a year. In two years, said Winiger, the purchases will pay for themselves.

The work to switch over the accounting software began in May and by July 2, that process was water and sewer bills are coming out on time.

The city bills about 4,000 utility customers a month. Bills are mailed out 1,000 at a time on a weekly basis. The last bills on the old system were mailed July 25. The bills for the week ending Aug. 1 were mailed this week.

They will be followed by the bills from Aug. 8 and 15 coming out later in August. Winiger hopes that by the first part of September, everything is back on schedule.

Customers should not be receiving two bills at one time, he added.

The Vadim software for utility billing comes from a Canadian company. Newport is the second American locale to have the software. The other is in Alaska.

While the software has all the bells and whistles the city wants, a few glitches have occurred, as it is made by Canadian programmers. Problems arose in formatting for the 500 city customers who have automatic bank withdrawal. The banking system used in Canada is different from that in the United States.

Another difference occurred in spelling and in the use of some words. The "current levy" is the amount owed and the British spelling "cheque" is used for the word check. "Centre" is the Canadian spelling for center, and so on.

The spelling of cheque was caught on the bills for business licenses that were sent out, but not on the licenses themselves. Winiger said the city received a few calls from businesses questioning the spelling on their licenses.

He thinks that all of the language differences have been corrected to



Diane Sanders holds up the new look to City of Newport water and sewer bills. New computer systems are cutting costs for the city, but causing a few headaches as changes are made from the old software. City water bills have been late this month but should be back on schedule in September. (Photo by Susan T. Wehren)

on plain paper, Winiger said. With the new accounting software, the city uses secure paper and special with a perforation on the top third.

The statements also have bar codes that make auditing eas...

DIANE L. SANDERS
PO BOX 1026
WALDPORT, OR 97394

Allen O'Neal, City Manager					June 21, 2006
City of Newport
169 SW Coast Highway
Newport, OR 97365

    RE:    ACETONITRILE MATERIAL SAFETY DATA SHEETS

Dear Mr. O'Neal:

Enclosed please find Material Safety Data Sheets and relative information on the chemical **_ACETONITRILE._** This is one of the chemicals that OSHA found on 12/22/05. PPM were in excess of acceptable OSHA standards as communicated to me by Andrea McDaniel on the phone on January 23, 2006 when she called me at home in Waldport to advise me that she did in fact, "find something" as she put it to me.

This finding was the reason why Ms. Nancy Boyer, interim City Manager asked me to leave the building on February 3, 2006. As a result of these findings, OSHA returned to do further testing on March 2, and March 3, 2006. I find it interesting that there was such a time lag before OSHA came back. Acetonitrile is a **_deadly_** chemical, especially because you cannot smell it until you are so chemically poisoned that you are sick, or, if you're really unlucky, you might be dead. I am grateful that I was a fairly healthy "specimen" before this chemical injury began. I would hate to think what might have happened to someone whose health was already compromised. One of the uses for Acetonitrile (besides paper making) is for tear gas.

I would think that a governmental agency supposedly working toward the goal of safety and health in the workplace (OSHA) would have returned *as soon as possible* to undertake an investigation to determine "the source" of the ACETONITRILE . Andrea McDaniel, OSHA Hygienist told me that she would be coming back to the City of Newport to determine the source in a second round of investigation and testing. I'm sure that the source was known all along. This would explain why the City's paper stock was changed on or about December 15, 2005. Paper quality was changed from 84 (low grade) to 94 bright, acid free. This would allow the air to "clean up" by the time OSHA same back on March 2 and March 3, 2006.

**Page 1 of 2**

As you can see, this is a very hazardous chemical. From September 2002 until May 2005 (when I, upon my own volition started leaving the copy room door open) I was working in the copy room with the door closed. The City Managers had **_mandated_** that no doors were ever to be left open because it would upset the temperature zones in the HVAC system. This means that from May 2005 until December 22, 2005, the door was left open, because I had to leave it open for ventilation. Just think about what the concentration level of ACETONITRILE was during that time when the door remained shut, from September 2002 until May 2005. I was working in a confined space on a weekly basis, spending intervals of time in the copy room, anywhere from 40 minutes to one hour as the bills were printing. I would hand sort the bills by zip code, PAP customers and multiple customers in an effort to save the City of Newport money. Then, I would go back the next day and run all of the bills through the postage machine. I hope that this makes you realize that my time spent in the copy room was considerable. My life and health was compromised for the sake of a few dollars. Procedures for processing water bills have changed dramatically since those days, thanks to me.

Sincerely,


Diane L. Sanders
Utility Billing/Finance Department
City of Newport


Enclosure: MSDS (2) on the deadly chemical, ACETONITRILE

## Diane Sanders

**From:** Diane Sanders
**Sent:** Tuesday, November 08, 2005 2:34 PM
**To:** Nancy Boyer
**Subject:** LACK OF VENTILATION IN COPY/WORK ROOM - AIR QUALITY ISSUE AND HEALTH ISSUE

NANCY:

I AM WONDERING WHAT THE STATUS IS OF THE ABOVE **SIGNIFICANT** SAFETY AND HEALTH ISSUE. I HAVE BEEN TALKING ABOUT THIS PROBLEM FOR OVER THREE MONTHS NOW. I'M GLAD IT WAS ADDRESSED IN THE LAST SAFETY MEETING ON OCTOBER 23, 2005. I WOULD LIKE TO KNOW WHAT ACTION THE COMMITTEE HAS TAKEN.

I WILL BE PRINTING BILLS ON 11/9/05 (I HOPE). THAT IS TOMORROW. I WILL NEED TO HAVE THE BACK DOOR OPEN WHILE I'M PRINTING BECAUSE THE FUMES FROM PRINTING THE BILLS ARE BOTHERING ME SO MUCH. I HOPE LEAVING THE DOOR OPEN FOR A WHILE TO CIRCULATE FRESH AIR WILL NOT BE A PROBLEM.

I AM ALSO PLANNING TO OBTAIN A RESPIRATOR TO WEAR WHILE I'M IPRINTING FROM NOW ON. THE FAN SYSTEM IN THE COPY ROOM IS NOT ADEQUATE. IT JUST BLOWS THE FUMES OUT INTO THE HALL SO THAT **EVERYBODY** GETS TO BREATH THEM. THESE FUMES ARE FAR FROM HARMLESS! I AM PRINTING ON AVERAGE 1000 BILLS EVERY WEEK, AND EVERY TIME I DO, I FEEL SICK. THIS TYPE OF PRODUCTION COULD BE CONSIDERED ABOUT THE SAME AS WORKING IN A SMALL PRINT SHOP. IN ADDITION TO THE ACTUAL BILL PRINTING, I AM CONTINUOUSLY RUNNING REPORTS RELATIVE TO THE PREPARATION OF THE WATER BILLS.

I HAVE REQUESTED STEVE RANSOM TO MOVE MY PRINTER OUT OF MY WORK SPACE. I AM HAVING SIGNIFICANT PROBLEMS IN MY AREA FOR THE SAME REASON – NO VENTILATION, NO WAY TO OPEN A WINDOW AND THE FUMES ARE MAKING ME FEEL VERY ILL. I SPOKE TO STEVE ABOUT THIS YESTERDAY, AND HE SAID NO PROBLEM.

THANK YOU,

DIANE

11/8/2005

**Diane Sanders**

**From:** Diane Sanders
**Sent:** Monday, November 14, 2005 10:00 AM
**To:** Linda Brown — (Supervisor at the Time)
**Cc:** Nancy Boyer
**Subject:** TOXIC CHEMICAL FUMES FROM XEROX TONER IN THE CITY'S COPY/WORK ROOM

DUE TO THE ABOVE SITUATION AND DUE TO THE FACT THAT I FEEL SICK WHEN I BREATH THESE FUMES, I WOULD LIKE TO REQUEST THAT SOMEONE OTHER THAN MYSELF BE RESPONSIBLE FOR RUNNING THE WATER BILLS THROUGH THE POSTAGE MACHINE UNTIL THERE IS AN ADEQUATE VENTILATION SYSTEM IN THE WORK/COPY ROOM.

AS I MENTIONED IN MY CORRESPONDENCE DATED NOVEMBER 8, 2005 TO NANCY, THE FAN THAT HAS BEEN PLACED IN THE WORK ROOM FOR VENTILATION JUST BLOWS THE FUMES AROUND FOR EVERONE TO BREATH, AND IT HAS NOT SOLVED ANYTHING.

SINCE THERE IS NOT ANY HAZARDOUS EXHAUST SYSTEM AT ALL IN THE WORK ROOM, I CAN NOT BE IN THAT ROOM FOR ANY EXTENDED PERIOD OF TIME. I AM RUNNING ALL OF MY REPORTS FOR PROCESSING WATER BILLS ON THE PRINTER IN THAT ROOM, AND JUST GOING IN THERE TO PICK THEM UP IS DEFINITELY ALL THAT I CAN HANDLE FOR EXPOSURE. MY HEALTH IS BEING COMPROMISED BY HAVING TO BREATH THESE FUMES.

I WOULD IMAGINE THAT AFTER YOU BOTH READ THE INFORMATION ABOUT THE TOXIC CHEMICALS IN THE XEROX TONER THAT I GAVE TO YOU ON NOVEMBER 9, 2005, YOU WOULD AGREE THAT AN EMPLOYEE SHOULD NOT BE REQUIRED TO WORK IN A HAZARDOUS CHEMICAL ENVIRONMENT THAT IS MAKING THEM ILL.

11/14/2005

5/6/06

To Whom It May Concern:

As Diane Sanders' former supervisor, she has asked me to write a statement regarding my recollection of various events related to her illness and resulting performance as an employee at the City of Newport. Diane asserted to me in a phone call on 5/5/06 that she was made ill by processing water bills. The bills were processed in two different rooms, neither of which was mechanically ventilated. Her belief is that the paper and/or toner purchased by the city for multiple years contained chemicals that she is apparently sensitive to. The lack of ventilation allowed a buildup of the chemicals in those spaces resulting in her illness.

I have no expertise in the toxicity of the materials involved nor the issues surrounding the ventilation of the work spaces, so I cannot offered guidance regarding those issues. I can only offer my own observations. I'll begin with Diane's assertions. Beginning with the processes required by the implementation of new software (2003), the city changed its method of producing water billings. At my direction, the city did indeed purchase some of the least expensive paper we could find in order to contain costs. We tried at least two suppliers but cost was of paramount concern. At no time was the possibility that the paper could cause illness ever considered or discussed. I understand the city has since changed to an acid-free paper.

As Diane asserts, the two processing rooms in question did not have mechanical ventilation. Diane approached me at least twice during the two years and complained that she believed something in the process of producing the bills was making her ill. At the time she suspected that the toner may have been the problem. At some point, she adapted her work procedures to attempt to minimize her exposure by allowing the bills to sit overnight and "air-out" before she folded them. Diane often took breaks outside commenting that she needed the fresh air.

I have no records to quantify in this letter, but Diane did miss more work than I would have considered normal during this time. I cannot say that it was worse after beginning the new processes, but she did have a variety of ailments that caused her discomfort and caused her to miss work during the time in question. Of course, I have no way of knowing how many of the physical problems were a direct result of the water bill processing.

I did not take immediate action on the complaints for multiple reasons. I wasn't sure how much of Diane's complaints were truly substantive and thought she was dealing with it by airing the bills overnight, opening the doors for more ventilation, etc. My intent was to outsource the printing and mailing of the water bills and I believed that action would eliminate Diane's concerns. I was stymied in those attempts for political reasons, but it appeared that I would still be able to accomplish that outsourcing in the near future. I had also considered the possibility of placing Diane in another position after an upcoming retirement which would also have eliminated the concern.

As an allergic person myself, I realize that these type of problems involving chemical sensitivities are nebulous and difficult to resolve. I would therefore be willing to answer any questions that are not resolved in this letter. Feel free to contact me at 701-355-8303.

Sincerely,

*[signature]*
Brent Winiger

Department of Consumer & Business Services
Oregon Occupational Safety and Health Division

# Notice of Alleged Safety or Health Hazards
Fri Dec 2, 2005 12:10pm

| | | Complaint Number | 205105281 |
|---|---|---|---|
| Establishment Name | City of Newport | | |
| Site Address | 169 SW Coast Hwy, Newport, OR 97365 | | |
| | Site Phone | (541) 265-5331 | Site FAX | |
| Mailing Address | 169 SW Coast Hwy, Newport, OR 97365 | | |
| | Mail Phone | (541) 265-5331 | Mail FAX | |
| Management Official | Nancy Boyer | Telephone | |
| Type of Business | | Ownership | |
| Primary SIC | 9131 | Primary NAICS | 921140 |

**HAZARD DESCRIPTION/LOCATION.** Describe briefly the hazard(s) which you believe exist. Include the approximate number of employees exposed to or threatened by each hazard. Specify the particular building or worksite where the alleged violation exists.

DESCRIPTION:

Item 1: Employees are using a copier in the "print room" without any ventilation and are suffering symptoms such as, respiratory irritation and sinus pain as a result.

Item 2: Items meant to be part of the agenda for the safety committee were removed by the Acting City Manager, Nancy Boyer.

LOCATION:
At site location

OSHA-7(Rev. 7/02)

**Plaintiff's Exhibit 006**
**Page 1 of 3**

# INTAKE

Log #: H-108

## WOULD YOU LIKE YOUR NAME TO BE KEPT CONFIDENTIAL?  ☐ Yes  ☒ No

Date: 11/10/05   Time: _____   Received by: Q8680 (CO ID#)   Complaint #: _____

Employer name (as given by complainant):    Employer ID and LOC #:

City of Newport    5602222-013

Legal name: _____    SIC code: 9131

DBA: _____    NAICS code: 921140

Site location: 169 SW Coast Hwy    Site phone: 541-265-5331

City, State, ZIP: Newport OR 97365    Site fax: _____

Mailing address: Same as above    Phone at mailing address: _____

City, State, ZIP: _____    Fax at mailing address: _____

Type of business: _____    Mgmt. official/title: Nancy Boyer, Acting City Manager

**Hazard description and location:**

Item 1: Employees are using a copier in the "print room" without any ventilation and are suffering symptoms such as respiratory irritation and sinus pain as a result.

Item 2: Items meant to be part of the agenda for the safety committee are removed by the Acting City Manager, Nancy Boyer.

Has this condition been brought to the attention of: ☒ Employer   ☒ Safety committee   ☐ Other government agency

Results: _Nothing Substancial_

Confidentiality of complainant:   ☐ Do **NOT** reveal name to employer

☒ Name **MAY** be revealed to employer

Complainant is:   ☐ Employee        ☐ Ex-employee

☐ Rep. of employees    ☒ Family member    ☐ Other: _____

Complainant name: Kent Sanders         Phone: 541-563-6716

Address: PO Box 1656                   Message no.: _____

City, State, ZIP: Waldport OR 97394

**NOTE:** Under ORS 654.991(3) it is unlawful to make false statements, representations, or certifications in any application, record, report, plan, or other documents filed. To do so may be punishable by a fine of not more than $10,000, imprisonment for not more than six months, or both.

Complainant signature: _Kent Sanders_         Date: _____

*If we do not receive this form signed, no action will be taken on this complaint.*

---

**OFFICE USE ONLY**

Evaluated by: _____

Date evaluated: _____

Supervisor assigned: _____

Evaluation/action:   ☐ Safety       ☐ Health          ☐ Request signature

☐ Imminent danger (1)   ☐ Serious (2)   ☒ OTS (3)

☐ Inspection    ☐ Phone/fax    ☐ Letter    ☐ No further action

CO assigned: _____

Referred to outside agency (specify) _____

**Comments:**

Type detailed information here. Text will wrap to the next line.

---

## *Draft* MINUTES
## CITY OF NEWPORT
## SAFETY COMMITTEE
Wednesday, November 23, 2005
8:30 a.m.
City Hall Conference Room 'A'

**Members Present:** Nancy Boyer, Dennis Reno, Greg Schaecher, Elwin Hargis, Dann Walker, Dean Sawyer, Lynn Dennis, and Wanda Haney.

**Members Absent:** Toby Cole, Jim Guenther, and Todd Sarazin.

Nancy Boyer called the meeting to order at 8:35 a.m. She stated that she hoped to have the Safety Committee re-organized and fully staffed by January.

The first item that Nancy wanted to cover was to bring the Committee up to date on a safety concern that had been raised at the last meeting regarding fumes from the copier. Nancy said that she has met with this individual and has temporarily taken away her duties of running the utility bills. Until the City can get to the bottom of her concerns, someone else from the department will be doing that. Nancy noted that the latest revised MSDS sheet for the toner is posted by the copier. Since the older version, the information of what to do in the event of inhalation had not changed; what had changed are some additions of other toners used in other machines, the substance had not changed. Nancy also noted that the fan had been placed in the copier room; however, the individual didn't think that was working because it wasn't getting rid of the fumes that were bothering her. She believes that was just putting it through the rest of the building, so the fan is not being used now. After Nancy met with the individual, Valerie Saiki from CCIS also met with her to get information on what her symptoms were, what she was feeling, and what suggestions she might have or what information she might have from her doctor. As a result, Nancy will be leaving the meeting early to meet with an environmental hygienist who will conduct air quality testing in the copier room. The environmental hygienist will place a meter in the copier room, on the person currently running the utility bills, and the individual with the concern even though she won't be directly in that room. Also, this individual's personal printer has been moved out of her work space at her own request. Nancy said that as an update, the individual now believes that her problem may not be directly related to the toner but to the ink on the paper. Nancy said that if the problem is caused by fresh ink; that is another area that would have to be explored, and that may be a difficult area to accommodate based on what the problem is. Nancy said the next step may be to rely on information from the individual's physician and information from an independent medical examiner. Nancy pointed out that the City is taking these concerns seriously; the City wants to and is interested in providing a work environment that is as safe as it can possibly

1

be. Nancy has sent the individual an outline on the steps the City is doing. The City will make sure that we are doing whatever we can. At this point, the City has tried our best to alleviate the problem. Ventilation was looked at. Originally it was thought that it might be easy to move the ventilation from the kitchen area to the copier room; but it really is not as simple as that. There is ventilation in the building. There are people that just have chemical sensitivities. There is only so much that the City is able to do; some things we don't have control over. Hopefully the air testing will show if there is an accommodation the City would be expected to make or whether there is not. Valerie was surprised at the size of the copier work room. After Valerie's visit, Nancy called Oregon OSHA and provided them with information on what the City is doing, what the toner information was on the MSDS sheet, and asked if the City should be doing anything else. OSHA's answer was "no". According to OSHA, nothing indicates the need for additional ventilation even in a much smaller area. The designers knew what the room was going to be used for when it was built. Also, Nancy will ask the copier service worker at the next regular visit to make sure that the machine is operating as it is supposed to be and will have them clean up any residue that may be in the machine. The concerned individual believes that the toner contains carcinogens; but the MSDS sheets state that there are no carcinogens. Nancy said that there is an ingredient called "black carbon". The MSDS for that chemical indicates that there is a percentage of carcinogens. So, even though one of the components in the toner shows a percentage of carcinogens, the toner itself doesn't show any level of carcinogens. Nancy said that according to the information available so far, under normal usage, the machine is not exposing anybody to a problem.




I. **Minutes:**

Greg Schaecher moved and Elwin Hargis seconded that the minutes from the meeting of October 26, 2005, be approved as presented. The motion carried unanimously in a voice vote.

II. **Unfinished Business:**

Was discussed above.

III. **New Business:**

A. **Review/Discussion of Accidents Which Have Occurred Since Last Safety Committee Meeting.**

There were no reportable accidents since the last Safety Committee meeting.

B. **Review/Discussion of the Supervisor Responses to the September Quarterly Workplace Inspections.**

The Committee reviewed and discussed the supervisor responses to the department quarterly workplace inspection reports for September.

2

For Nancy's information, Greg explained that they had found that at the pool the staff had not been informed on the location of the MSDS sheets. Nancy said that even though many of the pool staff are young and there is a lot of turn-over, they do have a responsible job. She will talk to Jim Protiva about maybe providing some safety training for them. Lynn Dennis said that she has talked to Toby Cole, and everything has been moved out of the mechanical room a the library. She wasn't sure about the address numbers for the building, even though someone was appointed to obtain some. It was mentioned that there is an ordinance on the required size for address numbers. Dann said that maybe a notice about the need for and the required size of house numbers should be included with the water bills. This would not only help the meter readers, but also the fire department.

Because she is new to the Committee, Lynn asked what the normal procedure was for responding to these workplace inspections. Her questions were answered.

Because Nancy had to leave, Greg presided over the rest of the meeting and continued the discussion of the inspections.

There was some concern over the remarks from the water treatment plant supervisor questioning the expertise of the Committee to conduct these inspections. Greg read from the response. Greg will meet with Nancy to discuss this further. These inspections are just something the City is required to do. The Committee doesn't portray ourselves as experts; we just make safety suggestions on things where we see the possibility of someone getting hurt. Dann pointed out that this will be his last meeting, he is resigning from the Committee. Even though some of the members were troubled with the tone of this letter because it is reduced to writing and is public record, everyone agreed to let Greg handle this. Elwin said that he had discussed GFIs with Chuck Crawford, City Electrical Inspector, and was informed that code does not require that all buildings be retrofitted with GFIs. Elwin stated, however, that it is easier to repair things now rather than after someone gets hurt. Jerry Sabanskas could do the GFI replacements under his maintenance license. It was mentioned that because of the hazard, it might be best to recommend doing this.

Lynn Dennis introduced herself. She is from the Library and had asked to be on the Committee. The Safety Committee process was explained to her.

Nancy has not yet talked to Linda Brown about any help she may want with the things in her office, but she will do so.

December will be inspection month. The inspection team will be made up of Dennis Reno, Lynn Dennis, and Toby Cole.

C.  **Review of Safety Suggestion/Concern Forms received Since the Last Meeting.**

3

There were no safety suggestions received.

**D.   Other New Business.**

Beginning with the new year, the Safety Committee meetings will be held on the third Wednesday of the month.

**IV.   Adjournment:**

The next meeting is scheduled for 8:30 a.m. on <u>January 18, 2006</u>, in Conference Room 'A' at City Hall. The meeting <u>adjourned at 9:45</u> a.m.

4

December 7, 2005

Attention
Nancy Boyer

nboyer@thecityofnewport

Dear Nancy Boyer,

        The first e-mail I sent you was just an informal heads-up as to a problem that exists at the City Hall. This e-mail is a formal request for you to address this issue. And I will outline it a little more in detail this time. Although what I sent you earlier should have been sufficient for you to understand the point I was trying to get across. That the City is in VIOLATION of both ORS and State Specialty Building codes by not having any ventilation installed in the printer room. Also being negligent in not having the proper MSDS sheet available for three years. Although in the MSDS sheet for the old printer it says prolonged exposure may cause minimal irritation of the respiratory passages on continuous exposure to high concentrations, again the area to be well ventilated. The new printer installed in the new city hall does contain TOXIC chemicals; all the chemicals in this toner are known to cause TUMORS in lab mice and respiratory problems. I know that with short exposures there is no long-term adverse effects as long as the printer is installed as to the Manufacturers Specifications which says use in a well ventilated area. As per the installation instructions that come with the equipment from the factory, the person installing this equipment should have read the Instructions seeing that it says use in a well ventilated area or maybe the Architect was at fault for design error. But the Key word here is ventilation and lack of, in violation of ORS. The manager is ultimately responsible.[ORS 654.315]

       I have read the report by Cathy Ellis of Wise Steps Inc. Industrial Hygiene Consultants on Dust. And I found some very interesting points that condemns the cities Copy Room to being red tagged as being in NON- COMPLIANCE with State Building Codes. Kathy Ellis of Senior Industrial Hygiene Consultants states on page 2 of her report that she stated that she tested the air movement in the copy room at head height and that demonstrated that there was little air movement from the ceiling down to 6'. This is well above the printer so at the printer there would be little if any air movement. She also conducted tests in the doorway of the copy room for air movement. Results were that there was no airflow in or out of the copy room. Which indicates static pressure exists in the room. There is neither positive pressure in which case air would move out the room. Likewise if there were a negative pressure in the room
The air would flow into the room. She tested the air outside the copy room door and there was air movement towards the back of the building. So air was moving across the doorway of the copy room, the air in the copy room should have either sucked the air into the room or it should have been pushing it out, you have Static air pressure. You have air anomalies in the copy room.
 In violation of many statutes within the Oregon Revised Statutes! And it is documented in this report. Also she mentions the fact that contrary to your statement as to not smelling any chemical fumes, Cathy Ellis experienced distinct chemical odors, Sulfur or Mercaptan and mentioned how the paper is heated during the printing process. Well if the paper is heated so is the ink, which is best described as a liquid plastic injected on to the paper surface and dries by off gassing, the paper is electro-statically charged so the solution only adheres to the paper where the text is imprinted by the computer. Chemical

*[signatures: Wong. / Andrea McDaniels]*

fumes are what Diane Sanders [Finance Dept.] has long been expressing a concern for, not Dust! And she has been treated as if she where the problem and not the chemicals that have been making her ill on and off for 3 years or better.   Your Consultant cemented Diane's claim that the fumes existed.        Did the tests include all the jobs that Diane performs with the printer at her desk and the workstation 555, all the chemicals-listed in the MSDS sheet for both toners. "NO"! Or all the paper Diane has handled right off the printer getting ink on her hands not to mention all the fumes from the ink off-gassing, she has been inhaling for better than three years without any warning from someone in authority whose job it is too insure her health and well being. If the proper MSDS sheet had been posted at the time the printer was installed some people especially diane would read it and handled the amount of printing done and how it would be handled differently It is the job of an employer to be sure that your people have the proper Safety and technical training on any and all equipment and any hazards involved if any.
If one did read the Oregon Safe Employment Act one could realize the responsibilities.
If one would read the Oregon Specialty Code book and look at chart 403.1, which lists the areas that require outside air ventilation, duplicating and printing rooms are listed as areas that are required to vent to outside air. So as not to contaminate the comfort air system with a contaminated exhaust air system.  Also in Oregon Specialty Code book is this section: Chapter 5 Exhaust Systems
502.1.1 General.
A exhaust system shall be provided, maintained and operated as specifically required by this section and for all occupied areas where machines, vats, tanks furnaces, forges, salamanders and other appliances, equipment and processes in such areas produce or throw off dust or particles sufficiently light to float in the air, **OR** which emit **heat, odors, fumes, spray,** gas or smoke, in such quantities so as to be "*irritating*" or *injurious* to *health*.       Do you know what the Oregon Safe Employment Act is? And where to find it?

## *SOLUTION*

> Install outside air vent with hood less than 6' away so as to remove from the building
> The Air contaminants that the Xerox workstation 555 is producing.

# \s\ *Kent Sanders [Retired State Licensed Steamfitter- 30 Years experience working under Boiler codes and Building Specifications Safety committees*

☐

*cc:BCDwebmaster@or.gov.*
*[Compliance Officer. State of Oregon]*
*cc:States Attorney General [Oregon]mail cc:*
*District Attorneys Office [Newport]-mail*
*cc: News Times- mail*
*cc:Oregonian- mail*
*cc:Federal OSHA- mail*



# BAY CLINIC, LLP

PHYSICIANS AND SURGEONS

1750 THOMPSON ROAD
COOS BAY, OREGON 97420

541-269-0333
In State Toll Free
1-800-824-8896
FAX 541-269-7389

**Internal Medicine**
WILLIAM D. KING, M.D.
TERRANCE S. BACH, M.D.
GREG SCHANDELMEIER, M.D.
PETER LUND, M.D.
ALINA I. RIZEA, M.D.
H. ROBERT YEH, M.D.
GUOPING FENG, M.D.
BRIAN BARGER, F.N.P.

**Dermatology**
KATHLEEN M. BROWN, M.D.

**General Surgery**
ALLAN A. INOUYE, M.D.

**Obstetrics & Gynecology**
STEPHAN J. GROTH, M.D.
JULIE A. BUTTS, C.N.M., N.P.
KATIE RAMIREZ, C.N.M., N.P.

**Pediatrics**
TERRELL L. CLARKE, M.D.
MICHAEL V. LANZA, M.D.
DANIELLE PORTEOUS, M.D.
JON YOST, M.D.

**Allergy**
JOSEPH T. MORGAN, M.D.

**Administrator**
DANIEL E. WALSH

January 13, 2006

Ms. Nancy Boyer
Acting City Manager
City of Newport Oregon
169 SW Coast Highway
Newport, OR

RE: Diane Sanders

Dear Ms. Boyer:

I examined Mrs. Sanders on this date. Her progressive physical illness appears to be directly related to an increasing and now severe sensitivity to fumes and odors as a result of her duties in the copy room and handling related materials, including the paper used in the Xerox machine. The only truly effective treatment available for a problem of this type is avoidance of the offending exposures.

Mrs. Sanders has had a significant deterioration in her state of health, and I have recommended as a first step a one month medical leave of absence. Complete avoidance of the work related exposures will, I believe, result in significant improvement. However, sensitivities of this type are usually persistent. If she returns to the same level of exposure which she has been experiencing at work, a prompt recurrence can be expected. Suggested measures which would be helpful long term would be improved ventilation in the copy room, so that any fumes are strongly exhausted to the outside, rather than being re-circulated into the rest of the building by the HVAC system.

It is recommended that she not have any duties requiring her to work in the copy room itself.

**Plaintiff's Exhibit 009**
**Page 1 of 2**

January 13, 2006
RE: Diane Sanders
Page Two


She has been able to handle recently supplied 96 Bright acid-free paper without the level of symptoms resulting from the previously used 84 Bright. It is recommended that 96 Bright be used for the printing of any material that she will subsequently be required to handle, including returned mail. Otherwise, she should not handle returned mail.

The utilization of latex or nitrile gloves is also recommended for handling of in-office papers to avoid further aggravating her contact dermatitis.

Mrs. Sanders also mentioned that at one time possible out-sourcing of the printing of the monthly statements was at least mentioned. If this would minimize utilization of the Xerox machine, it could be of benefit to anyone working in the building. It is estimated that up to 26% of the general population has some degree of sensitivity to fragrances and a host of other chemical odors. There has been an upsurge of a condition often referred to as building-related illness with the advent of tightly closed buildings and utilization of HVAC systems which do not bring in an adequate supply of fresh air and re-circulate VOCs (volatile organic compounds) throughout a building. It is entirely conceivable that other city employees could be at risk for future problems.

If you have any questions regarding Mrs. Sanders, please feel free to contact me.

Sincerely yours,

Joseph T. Morgan, M.D.

JTM/rc

DIANE L. SANDERS<br>
PO BOX 1026<br>
WALDPORT, OR  97394

Allen O'Neal, City Manager          June 21, 2006  
City of Newport  
169 SW Coast Highway  
Newport, OR 97365

RE:    Diane L. Sanders, Utility Billing Clerk, Finance Department  
        Request for immediate reinstatement to position no later than June 27, 2006

---

Dear Mr. O'Neal:

As of this date, the City of Newport has received all of the necessary medical releases relative to my medical situations. A third letter from Dr. Morgan dated June 5, 2006 was mailed to Ms. Nancy Boyer on June 7, 2006. I also received a copy of that letter, and I am sending you a copy of that letter for your records in case you did not see it. Ms. Boyer had requested further clarification from Dr. Morgan regarding paper quality after Dr. Morgan had sent two other letters.

***I am making another formal demand as of this date to be reinstated to my former position with the City of Newport no latter than Tuesday, June 27, 2006.***

It is unlawful for any employer to take any adverse employment action on because an employee has filed a workmen's comp claim. It is also against the law to discriminate against any employee based on a disability.

My disability is "Multiple Chemical Sensitivity", now a formally recognized condition in the State of Oregon as well as eight other states. Dr. Morgan's letter dated June 5, 2006 (copy enclosed) does not state the specific disability. I spoke to Tara, the office manager at Dr. Morgan's office on or about June 6, 2006. She stated that Dr. Morgan had spoken with Mr. Robert Radler, Attorney for C.I.S. in a telephone conference about this issue. Tara informed me that Attorney Radler had advised Dr. Morgan that the specific diagnosis *did not need to be included* in his (Dr. Morgan's) letter. I took exception to this at the time and stated as such to Tara from Dr. Morgan's office. Tara's response was, "if Nancy Boyer has a problem with it, tell her to talk to Robert Radler." Therefore, there should not be any impediments to my return to work. I'm sure that the Finance Department employees that have been working overtime to cover my position are getting tired of the long hours, or, maybe by now, the City of Newport has hired a temp to cover some of the duties. In any case, it cannot be stated that I am no longer needed, or that the City has found a way to eliminate my job. Remember, I have

worked for the City of Newport for over nine years. I know what it takes to get the job done, and I set up the whole water billing procedure and system to accommodate this. The City has water and sewer rate changes coming up starting with the July 2006 billing, as well as the Winter Quarter Averaging special seasonal billing for all residential customers starting with the July 2006 billing. These are special functions requiring extra time and data input.

Sincerely,

*Diane J. Sanders*

Diane L. Sanders
Utility Billing/Finance Department
City of Newport

Enclosure: Letter from Dr. Morgan dated June 5, 2006